## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES M. YOUNG, SR., *et al.* | | No. 4:18-CV-0403 |
| Plaintiffs, | | (Judge Brann) |
| v. | | |
| SCOTT TOWNSHIP, *et al.*, | | |
| Defendants. | | |

## MEMORANDUM OPINION

### JUNE 26, 2020

## I.    BACKGROUND

Two motions for summary judgment are ripe for the Court's disposition.

Plaintiffs have concurred with the motion for summary judgment made by Defendants Megan Fetterman and Columbia Montour Snyder Union Counties of Central Pennsylvania Service System.[1]  Therefore, the Court grants this motion. And the Court dismisses with prejudice all claims against Fetterman and Columbia Montour Snyder Union.

Plaintiffs do contest, however, the second motion.  This one comes from Defendants Scott Township, Chief Raymond Klingler, Sergeant Joseph Grassley, Officer Vincent Figueiredo, and Officer Paul Kelly (the "Scott Township Defendants").  The Court also grants these Defendants' motion.

---

[1]  *See* Docs. 79, 90.

## II.    DISCUSSION

### A.    Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment.  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[2] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]  "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[4]  "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[5]  "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[6]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of

---

[2]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[3]    Fed. R. Civ. P. 56(a).

[4]    *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[5]    *Clark*, 9 F.3d at 326.

[6]    *Id.*

proof that would apply at the trial on the merits."[7]  Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[8] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[9]  "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[10] The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[11]  "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may,

---

[7]  *Liberty Lobby, Inc.*, 477 U.S. at 252.
[8]  *Id.*
[9]  *Id.*
[10]  *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).
[11]  *Celotex*, 477 U.S. at 323 (internal quotations omitted).

and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[12]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[13]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[14]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[15]  Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

---

[12]  *Id.*

[13]  *Liberty Lobby*, 477 U.S. at 250.

[14]  Fed. R. Civ. P. 56(c)(1).

[15]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

undisputed for purposes of the motion."[16]  On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[17]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[18]  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[19]  "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[20]

## B.    Undisputed Facts

With that standard outlining the Court's framework for review, I now turn to the undisputed facts of this matter.

### 1.    Jonathan Young

Jonathan Young resided at 2700 Lackawanna Avenue, Lot 5, Bloomsburg, Columbia County, Pennsylvania 17815.[21]

Young suffered from schizophrenia and had been involuntarily committed numerous times in the past.[22]  Scott Township (Columbia County) officers assisted in serving Section 302 involuntary commitment warrants on Young in the past.

---

[16]  Fed. R. Civ. P. 56(e)(2).
[17]  Fed. R. Civ. P. 56(c)(3).
[18]  *Liberty Lobby*, 477 U.S. at 249.
[19]  *Id.*
[20]  *Id.* at 249-50 (internal citations omitted).
[21]  Doc. 84 at ¶ 2.
[22]  Doc. 84 at ¶¶ 3-4.

Young was not violent during the previous interactions with Scott Township officers.[23]

Young drank alcohol and had a history of drug use.  Young was a frequent user of the drug called "bath salts."  Young had been arrested before for drug use.[24]

### 2.      Events Prior to the Police's Entry

Young was hallucinating on the day of this incident – November 13, 2016. That day, Young was not taking his mental health medication.  Young's parents believed he needed immediate medical help and should have been admitted to the hospital.  November 13, 2016 was the worst that James Young ("James"; Young's father) had seen his son's behavior.[25]

In keeping, a Section 302 involuntary commitment warrant ("the warrant") was issued for Young on November 13, 2016.[26]  Meghan Fetterman was an intervention specialist for Columbia Montour Snyder Union ("CMSU") and mainly dealt with mental health crises.[27]  Young's parents provided information regarding Young's mental health to Fetterman; she approved the warrant and requested that Scott Township officers assist in serving it.[28]

---

[23]   Doc. 84 at ¶¶ 5-6.
[24]   Doc. 84 at ¶¶ 7-10.
[25]   Doc. 84 at ¶¶ 12-15.
[26]   Doc. 84 at ¶ 16.
[27]   Doc. 84 at ¶¶ 17-18.
[28]   Doc. 84 at ¶¶ 19-21.

Officers believed Young was a danger to himself and to others on the incident date.[29]  James told the officers that his son had physically grabbed his mother.  James told the officers that his son had tools such as a hammer and screwdrivers in the residence.  James told the officers that Young had a baseball bat inside his residence (a trailer), and that Young had chased him and his wife out of the residence using the baseball bat.[30]

Sandra Young ("Sandra"; Young's mother) wanted the officers to do what was necessary to get her son to the hospital.  James suggested that the officers break a window to get into the trailer.  Officers as well as Fetterman spoke to Young in an effort to convince Young to exit his residence.  Officers had Judy Snyder, Young's aunt to whom he was close, speak to Young on the phone and in-person to convince him to come out of his residence.  Officers had Snyder try to convince Young to open the door to let his dog out in an effort to have him exit the residence.  And officers had Young's parents speak to Young in an effort to get him to come out of his residence.[31]

While his family, Fetterman, and officers were trying to convince Young to come out, they could hear Young barricading the door and nailing it shut.[32]  James

---

[29]  Doc. 84 at ¶¶ 22-23.  Plaintiffs attempt to contest these facts.  But Plaintiffs have not marshaled enough evidence to create a genuine dispute.  *See* Doc. 89 at ¶¶ 22-23.
[30]  Doc. 84 at ¶¶ 24-27.
[31]  Doc. 84 at ¶¶ 28-35.
[32]  Doc. 84 at ¶ 36.

drew a diagram of the residence for officers.[33]  Officers made the decision to enter Young's residence after mental health workers, officers, and family members had tried to convince Young to come out because Young posed a danger to himself and to others.[34]  And officers made the decision to enter Young's residence pursuant to the Section 302 warrant.[35]

Officers and Meghan Fetterman did not anticipate a violent response from Young when officers entered the residence.[36]  Officers made the decision to enter Young's residence while on the scene, based on the totality of the circumstances.[37] They made this decision after an hour had passed with no success in convincing Young to exit the residence.[38]  While his family, Fetterman, and officers were trying to convince him to come out of his residence, Young readied himself for entry and made things more dangerous for the officers.[39]

### 3.   Events Inside the Residence

Young greased the floor just inside the door, making the floor slippery.[40] Young retreated to his bedroom.[41]  He had a hatchet and a baseball bat in his

---

[33]  Doc. 84 at ¶ 37.
[34]  Defendants claim this convincing took "close to one hour" but do not support this claim with evidence.  *See* Doc. 84 at ¶ 38.  Plaintiffs have not marshaled enough evidence to create a genuine dispute of material fact.  See Doc. 89 at ¶ 38.
[35]  Doc. 84 at ¶ 39.
[36]  Doc. 84 at ¶ 40.  Plaintiffs have not marshaled enough evidence to create a genuine dispute of material fact.  *See* Doc. 89 at ¶ 40.
[37]  Doc. 84 at ¶ 41.
[38]  Doc. 84 at ¶ 42.
[39]  Doc. 84 at ¶ 43.
[40]  Doc. 84 at ¶ 44.
[41]  Doc. 84 at ¶ 45.

possession.[42]   Young was given orders throughout his interactions with officers in the house to drop the hatchet and baseball bat.[43]

Young was screaming and yelling while officers were inside the residence.[44] Young emerged out of the residence's bathroom, advancing toward the officers, swinging the baseball bat and the hatchet.[45]   Officer Figueiredo utilized his taser on Young to no avail.[46]   The taser did not subdue Young.[47]   Young retreated into the bathroom.[48]

Young came out his bathroom a second time advancing towards officers and swinging the baseball bat and the hatchet.[49]   An officer yelled "hatchet" as Young charged the officers.[50]   Sergeant Grassley discharged his firearm—with this shot in response to Young's actions.[51]   Then, Sergeant Grassley discharged his firearm a second time.[52]   Three days later, Young died.[53]

---

[42]   Doc. 84 at ¶¶ 46-47.
[43]   Doc. 84 at ¶ 48.
[44]   Doc. 84 at ¶ 49.
[45]   Doc. 84 at ¶ 50.
[46]   Doc. 84 at ¶ 51.
[47]   Doc. 84 at ¶ 52.
[48]   Doc. 84 at ¶ 53.
[49]   Doc. 84 at ¶ 54.
[50]   Doc. 84 at ¶ 55.
[51]   Doc. 84 at ¶ 56.
[52]   Doc. 84 at ¶ 58.  The parties dispute *why*—or, *what precipitated*—Sergeant Grassley firing this second shot.  Defendants state that "Young charged officers a third time swinging a baseball bat and helmet," and that "Sergeant Grassley discharged his firearm a second time in response to Young's actions."  Doc. 84 at ¶¶ 57-58.  In my view, Plaintiffs have done enough to dispute these facts.  *See* Doc. 89 at ¶¶ 57-58; Doc. 91 at 9-10, 15, 18-20.  And, by extension, Plaintiffs have done enough to dispute the next fact that Defendants offered—that "Sergeant Grassley discharged his firearm because of the fear that Young would kill himself and Officer Kelly."  Doc. 84 at ¶ 59; *see* Doc. 89 at ¶¶ 57-59.
[53]   Doc. 84 at ¶ 11.

### 4.    Scott Township Policies and Trainings[54]

Scott Township Police Department has a "Legal Service" policy.[55]  The "Legal Service" policy discusses persons who may be subject to involuntary emergency examination and treatment.[56]  The Scott Township Police Department conducts training on barricaded persons.[57]

### 5.    Chief Klingler's Training and Qualifications

Chief Klingler was trained in hostage negotiations.  He attended a training with CSMU called "Serious Mental Illness: What Police Officers Need to Know."  He has SWAT training regarding high risk warrant execution.  He was on the Columbia County Montour SWAT team for twelve years.[58]

Chief Klingler received training on barricaded or suicidal persons, violent/dangerous people, crisis and emergency management, and mental illness and behavioral health issues.[59]  Further, Chief Klingler has experience with barricaded individuals with mental illnesses in the past.[60]  And he has executed Section 302 warrants in the past.[61]

---

[54] The parties dispute whether Scott Township Police Department has a "Barricaded Person" policy.  *See* Doc. 84 at ¶ 64; Doc. 89 at ¶ 64.

[55] Doc. 84 at ¶ 65.

[56] Doc. 84 at ¶ 66.

[57] Doc. 84 at ¶ 67.  Plaintiffs have not marshaled enough evidence to create a genuine dispute of material fact.  *See* Doc. 89 at ¶ 67.

[58] Doc. 84 at ¶¶ 68-71.

[59] Doc. 84 at ¶¶ 72-75.

[60] Doc. 84 at ¶ 76.

[61] Doc. 84 at ¶ 77.

### 6.      Officer Figueiredo's Training and Qualifications

Officer Figueiredo has training regarding barricaded persons.[62]  He also has

training on crisis and emergency management as well as de-escalation

techniques.[63]  Officer Figueiredo has training on interactions with individuals who

are mentally ill.[64]

### 7.      Officer Kelly's Training and Qualifications

Officer Kelly has training on crisis and emergency management, as well as

on negotiating with individuals who are mentally ill.  Officer Kelly has taken the

training course "Invisible Wounds."[65]

### 8.      Sergeant Grassley's Training and Qualifications

Sergeant Grassley has taken the training course "Invisible Wounds."[66]

Sergeant Grassley has training regarding barricaded persons.[67]  Sergeant Grassley

also had training on crisis and emergency management and is trained on

individuals who are mentally ill.[68]

---

[62]   Doc. 84 at ¶ 78.  Plaintiffs have not marshaled enough evidence to create a genuine dispute of material fact.  *See* Doc. 89 at ¶ 78.

[63]   Doc. 84 at ¶¶ 79-80.

[64]   Doc. 84 at ¶ 81.  Plaintiffs have not marshaled enough evidence to create a genuine dispute of material fact.  *See* Doc. 89 at ¶ 81.

[65]   Doc. 84 at ¶¶ 82-84.

[66]   Doc. 84 at ¶ 85.

[67]   Doc. 84 at ¶ 86.  Plaintiffs have not marshaled enough evidence to create a genuine dispute of material fact.  *See* Doc. 89 at ¶ 86.

[68]   Doc. 84 at ¶¶ 87-88.

## C.    Analysis

### 1.    Plaintiffs' Americans with Disabilities Act and Rehabilitation Act Claim (Count II)

Plaintiffs' Count II issues under Title II of the Americans with Disabilities Act and under the Rehabilitation Act.[69]  Plaintiffs concede that the "wrongful arrest" theory of liability does not apply.[70]  Plaintiffs' claim fails because Plaintiffs have not shown the Scott Township Defendants' "deliberate indifference."

Deliberate indifference satisfies the showing of intentional discrimination that a plaintiff must make to recover damages in ADA cases.[71]  A plaintiff can show deliberate indifference by showing (1) "knowledge that a federally protected right is substantially likely to be violated" and (2) "failure to act despite that knowledge."[72]  A plaintiff can make this showing by submitting evidence of (a) existing policies causing a "failure to adequately respond to a pattern of past occurrences of injuries like" Plaintiffs'; or (b) "the risk of cognizable harm" being "so great and so obvious that the risk and the failure to respond will alone support finding deliberate indifference.[73]

Here, given the above facts, Plaintiffs have not shown the Scott Township Defendants' deliberate indifference.  Officers assisted in serving Section 302

---

[69]   Doc. 1 at ¶¶ 76-92.  Courts interpret these two laws the same way.  *See Chisolm v. McMainimon*, 275 F.3d 315, 324 n.9 (3d Cir. 2001).  For shorthand, the Court will simply refer to "ADA" cases during this discussion.

[70]   *See* Doc. 83 at 6-7; Doc. 91 at 27-29.

[71]   *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013).

[72]   *Id.* at 265.

[73]   *Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir. 2018) (cleaned up).

warrants on Young in the past, and Young had not been violent.  Further, Plaintiffs

have not shown any instances of the Scott Township Defendants failing to

adequately respond to a pattern of past occurrences involving like mentally ill

individuals.  Indeed, the officers in question had been trained on barricaded

persons, high risk warrant execution, crisis and emergency management, and

dealing with the mentally ill.  The Court, due to the Scott Township Defendants'

lack of deliberate indifference, dismisses Plaintiffs' Count II.[74]

### 2.   Plaintiffs' Excessive Force Claim (Counts IV and V)

A particular use of force's "reasonableness" "must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision

of hindsight."[75]  "The calculus of reasonableness must embody allowance for the

fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of

force that is necessary in a particular situation."[76]

---

[74]  *See id.* at 182; *see also Houck v. City of Prairie Vill.*, 978 F. Supp. 1397, 1406 (D. Kan. 1997), *aff'd*, 166 F.3d 347 (10th Cir. 1998) (police officers' actions in dealing with mentally ill plaintiff "[did] not represent deliberate indifference to a risk of harm or the failure to take reasonable measures to prevent harm"; "[t]o the contrary, it was a reasonable response, if not the only reasonable response, to the situation"); *compare with Young v. Sunbury Police Dep't*, 160 F. Supp. 3d 802, 811 (M.D. Pa. 2016) (officer was told that plaintiff suffered from disabilities and required immediate medical attention but said he did not "buy it").  Plaintiffs' short arguments for deliberate indifference via the entry to the residence or via a failure to train, *see* Doc. 91 at 29, are unavailing.

[75]  *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[76]  *Id.* at 396-97.

Plaintiffs argue that Sergeant Grassley's second shot constituted an excessive use of force.[77]  A police officer is permitted to use deadly force if that officer has probable cause to believe that a suspect poses a significant threat of death or serious physical injury to the officers or others.[78]  But in this case, regardless of whether or not Sergeant Grassley's second shot constituted excessive force, qualified immunity shields the Scott Township Defendants from liability.

Qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[79]  The inquiry for whether a right is "clearly established" is "an objective (albeit fact-specific) question," where an officer's "subjective beliefs . . . are irrelevant."[80]  A district court must consider "only the facts that were knowable to the defendant officer."[81]

Here, Plaintiffs must show that "the violative nature of [Sergeant Grassley's] particular conduct [was] clearly established."[82]  They may do so by "identify[ing] a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the [constitutional provision at

---

[77]  *See* Doc. 91 at 15-20.
[78]  *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985).
[79]  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (cleaned up).
[80]  *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).
[81]  *White v. Pauly*, 137 S. Ct. 548, 550 (2017).
[82]  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017).  I hold that, given the facts I have provided above and detail again below, this is not one of those "rare cases" where Plaintiffs have shown an "obvious" violation of a clearly established right.  *See James v. New Jersey State Police*, 957 F.3d 165, 169 (3d Cir. 2020).

issue."[83]  This Court "first look[s] to factually analogous precedents of the

Supreme Court and the Third Circuit," and then to "persuasive authorities, such as

[the Third Circuit's] nonprecedential opinions and decisions from other Courts of

Appeals," while "consider[ing] all relevant cases under this inquiry, not just those

cited by the parties."[84]  The events here occurred on November 13, 2016.  This

Court looks to whether this right was clearly established as of that date.[85]

Here, the salient facts and circumstances are as follows.  (I reproduce them

from the factual discussion above.)

1.   Scott Township police officers were serving a Section 302 commitment warrant on Jonathan Young, who they believed posed a danger to himself and to others.

2.   The officers had been told that Young had tools such as a hammer and screwdrivers, as well as a baseball bat, inside the residence.

3.   Young had barricaded the door and nailed it shut.

4.   Young had greased the floor of his residence and made it slippery.

5.   Young had a hatchet and baseball bat, and the officers had given him orders to drop these items.

6.   Young was screaming and yelling throughout.

7.   Young first advanced towards the officers while swinging the baseball bat and the hatchet.

8.   After being tazed, Young was not subdued, but he retreated into the residence's bathroom.

9.   Young then came out of his bathroom a second time, advancing towards officers and swinging the baseball bat and the hatchet.

---

[83]   *White*, 137 S. Ct. at 552.
[84]   *James*, 957 F.3d at 170.
[85]   *See Bryan v. United States*, 913 F.3d 356, 363 (3d Cir. 2019).

10.     Sergeant Grassley discharged his firearm.

11.     Then, Sergeant Grassley discharged his firearm a second time.

I have reviewed the relevant precedents and persuasive authorities and I find that Plaintiffs have not shown that "the violative nature of [Sergeant Grassley's] particular conduct [was] clearly established" as of November 13, 2016.  The key facts, in my view, are that Sergeant Grassley had to make a split-second decision in dealing with a suspect who had just advanced on him twice, screaming and yelling, while swinging a baseball hat and a hatchet.  This suspect had earlier barricaded his residence's door, nailing it shut and greasing its floor to make it slippery.  Based on the "full context, with an eye toward the proportionality of the force in light of all the circumstances,"[86] I cannot find that "the justification for [Sergeant

---

[86]   *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994); *see Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (reviewing previous cases and explaining that "the question was whether the totality of the circumstances justified a particular sort of search or seizure"); *Gaymon v. Esposito*, No. CIV.A. 11-4170 JLL, 2013 WL 4446973, at *6 (D.N.J. Aug. 16, 2013) ("the application of the qualified immunity defense in the special context of excessive force claims under the Fourth Amendment requires an assessment, under the totality of the circumstances . . .").

The fact that I must conduct this review with an eye towards the totality of the circumstances is important because it dulls Plaintiffs' only real argument against qualified immunity: that "there is a fact issue as to whether or not Decedent was unarmed" at the time of Sergeant Grassley's second shot. Doc. 91 at 22.  Plaintiffs focus in on Sergeant Grassley's second shot, but they minimize the impact of the actions that Young took before that.  In *Rowland v. Perry*, the United States Court of Appeals for the Fourth Circuit shook off the defendant's request to adopt "a segmented view of the sequence of events."  The Fourth Circuit noted that "[t]his approach seems to us to miss the forest for the trees" and that "[a]rtificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness."  41 F.3d at 173.  I agree.

Grassley's] use of force [had] ceased."[87]  And, by extension, Sergeant Grassley

was not violating a clearly established right as of November 13, 2016.[88]

### 3.    Plaintiffs' Unlawful Entry Claim (Count IV)

Plaintiffs purport to bring a Fourth Amendment claim "against all Scott

Township officers based on unlawful entry into [Young's] home."[89]  According to

Plaintiffs, "officers clearly violated the knock and announce rule."[90]  But "[t]he

Fourth Amendment's flexible requirement of reasonableness should not be read to

mandate a rigid rule of announcement that ignores countervailing law enforcement

interests."[91]  I hold that the Scott Township officers, in their execution of a Section

302 involuntary commitment warrant, and given the circumstances and facts that

preceded their entry, did not violate the knock and announce rule in their entry into

the residence.[92]

---

[87]  *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009).

[88]  *See Lane v. City of Camden*, No. CIV. 11-5584 RBK/JS, 2015 WL 5603039, at *8-*9 (D.N.J. Sept. 23, 2015) (officers received qualified immunity when they discharged their weapons only after suspect "advanced upon [them] quickly" and "lung[ed] at them with a large knife"); *see also Mitchell v. Schlabach*, 864 F.3d 416, 421-22 (6th Cir. 2017); *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015); *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir. 1992).  Plaintiffs' cited case, *Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011), is inapposite.  In *Lamont*, the defendant officers were in an open field, discharged thirty-five rounds (many into the suspect's back), and had a much longer time to assess the potential danger that the suspect posed.

[89]  Doc. 91 at 12.

[90]  *Id.*

[91]  *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).

[92]  *See Doby v. DeCrescenzo*, 171 F.3d 858, 870 (3d Cir. 1999); *Linbrugger v. Abercia*, 363 F.3d 537, 539, 542 (5th Cir. 2004) (upholding police officers' entry into residence in order to "serve a judicial warrant . . . for [plaintiff's] involuntary mental health commitment"); *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 546-47 (1st Cir. 1996) (city's policy of permitting police officers to execute involuntary civil commitment orders by means of forcible, warrantless entries into private residences did not violate Fourth Amendment).

### 4.     Plaintiffs' *Monell* Claim (Counts I and III)

"[T]he requirement of an underlying constitutional violation is implicit in the Third Circuit's *Monell* framework."[93]  The absence of "an underlying constitutional violation" compels summary judgment for the Scott Township Defendants on Plaintiffs' *Monell* claim, which Plaintiffs have asserted through their Counts I and III.[94]

### 5.     Plaintiffs' State Law Torts Claims (Counts VI-VIII)

Plaintiffs bring three tort claims under Pennsylvania law: assault, battery, and negligent infliction of emotional distress.[95]  The Scott Township Defendants assert that the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") grants them immunity.[96]  The PSTCA certainly applies to Plaintiffs' claim of negligent infliction of emotional distress.[97]  The other two torts pose a closer question.  Though this Act does not protect actions done with "actual malice or willful misconduct,"[98] "to rise to the level of willful misconduct, a police officer must intend to commit the intentional tort."[99]  Plaintiffs marshal their assault and battery claims against Sergeant Grassley, but Plaintiffs "did not offer any evidence

---

[93]   *Lansberry v. Altoona Area Sch. Dist.*, 356 F. Supp. 3d 486, 497 (W.D. Pa. 2018).

[94]   *See* Doc. 1 at ¶¶ 65-75, 93-102.

[95]   *See* Doc. 1 at ¶¶ 117-131.

[96]   *See* Doc. 83 at 23-24.

[97]   *See Dashner v. Riedy*, Civ. A. No. 99-2124, 2004 WL 203193, at *8 (E.D. Pa. Jan. 28, 2004) ("The allegation of negligence inherent in a claim for negligent infliction of emotional distress contradicts the willful misconduct required to defeat the state's grant of immunity to its officials or subdivisions.")

[98]   42 Pa. C.S.A. § 8550.

[99]   *Brummell v. City of Harrisburg*, No. 1:09-CV-01816, 2010 WL 3896382, at *3 (M.D. Pa. Sept. 30, 2010).

showing that [Grassley] intended to violate [Young's] rights."[100]  Further, as

qualified immunity protected Grassley from Plaintiffs' excessive force claim, it

likewise protects Grassley from Plaintiffs' assault and battery claims.[101]  Thus, the

PSTCA shields the Scott Township Defendants from liability for all three of

Plaintiffs' state law torts claims.

## III.   CONCLUSION

The facts of this case are tragic.  They evoke deep sorrow.

Yet feelings do not create rulings.  As Alexander Hamilton wrote in the

Federalist Papers, the federal judiciary, of which I am a member, has "no direction

either of the strength or of the wealth of society," "and can take no active

resolution whatsoever.  It may truly be said to have neither FORCE nor WILL, but

merely judgment."[102]  As federal judges, we make their decisions "because they are

right, right in the sense that the law and the Constitution, as we see them, compel

the result."[103]

As I have explained above, settled rules of law compel dismissal of

Plaintiffs' claims.  Federal judges carry a "charge under the law to uphold the

---

[100]  *Salaam v. Wolfe*, No. CV 14-2055, 2019 WL 3889745, at *5 (E.D. Pa. Aug. 19, 2019), *aff'd*, 806 F. App'x 90 (3d Cir. 2020); *see also Vargas v. City of Philadelphia*, 783 F.3d 962, 975 (3d Cir. 2015) ("As the record makes clear, the officers' actions here do not rise to the level of willful misconduct.").

[101]  *Salaam v. Wolfe*, 806 F. App'x 90, 90 (3d Cir. 2020); *Chapolini v. Capodanno*, No. CV 18-2629, 2019 WL 4242508, at *14 n.11 (E.D. Pa. Sept. 5, 2019).

[102]  The Federalist No. 78, p. 523 (J. Cooke ed. 1961) (emphasis in original).

[103]  *Texas v. Johnson*, 491 U.S. 397, 420-21 (1989) (Kennedy, J., concurring).

principles found in our nation's Constitution and their enforcement throughout the years by the Supreme Court."[104]  I have done so here.

* * *

The Court grants the motion for summary judgment made by Defendants Megan Fetterman and Columbia Montour Snyder Union Counties of Central Pennsylvania Service System.  The Court dismisses with prejudice all claims against Defendants Fetterman and Columbia Montour Snyder Union.

The Court also grants the motion for summary judgment made by the Scott Township Defendants.  The Court dismisses with prejudice all claims against Defendants Scott Township, Chief Raymond Klingler, Sergeant Joseph Grassley, Officer Vincent Figueiredo, and Officer Paul Kelly.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[104] *Am. Civil Liberties Union v. Gonzales*, 478 F. Supp. 2d 775, 820 (E.D. Pa. 2007), *aff'd sub nom. Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181 (3d Cir. 2008).